UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,                     :
                                              :        MEMORANDUM
       -against-                              :        AND ORDER
                                              :        13-cr-349 (WFK)
DARIAN WEBSTER,                               :
                                              :
                   Defendant.                 :
------------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Defendant Darian Webster is charged with narcotics distribution conspiracy and use of a firearm during and in relation to a drug trafficking crime. On January 17, 2013, Officer Hoder heard gunshots from behind a Brooklyn, New York residence. After proceeding to the backyard of the house, the officer purportedly witnessed the Defendant holding a gun while standing on top of the garage. When Defendant allegedly ran into the house, police officers searched the house for him and found marijuana. Based on the discovery of marijuana, officers later applied for and received a warrant. Inside the house, the officers found and seized marijuana, firearms, ammunition, currency, bulletproof vests, and scales.

Defendant now argues that the officers' search of the house violated the Fourth Amendment and moves to suppress the seized physical evidence. The Court denies Defendant's Motion to Suppress.

## BACKGROUND

### I.     Procedural History

The Complaint in this case was filed on May 14, 2013 and unsealed the next day. Dkts. 1, 3. Defendant was indicted on June 11, 2013. Dkt. 10. In the Superseding Indictment, filed July 2, 2013, Defendant was charged with narcotics distribution conspiracy (21 U.S.C. §§ 846 and 841(b)(1)(D)) and use of a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)(i)-(iii)). Dkt. 15.

On May 20, 2014, Defendant moved to suppress the physical evidence recovered on the day of his arrest. *See* Dkts. 28 ("Mot."), 30 ("Resp."). The Court held a suppression hearing on

July 30, 2014, and the parties completed their post-hearing briefing by November 21, 2014. Dkts. 39 ("Opp."), 40 ("Reply"), 41 ("Sur-Reply").

## II. Factual Background

At the suppression hearing, Officer Hoder testified that on January 17, 2013, he, along with Sergeant Santiago, heard gunshots near 417 East 51st Street in Brooklyn, New York. Dkt. 36 (Transcript of 7/30/14 Suppression Hearing ("Tr.")) at 8. Officer Hoder then proceeded to enter the backyard of the residence, where he testified that he observed an individual standing on the roof of a garage with his arm raised in the air. *Id.* at 12. That individual appeared to be holding a gun in his outstretched hand. *Id.* Officer Hoder testified that he stated: "Police, don't move," and moved forward toward the individual. *Id.* According to Officer Hoder's testimony, the individual dropped the gun and ran toward Officer Hoder, which enabled Officer Hoder to view him and identify him as Defendant Darian Webster. *Id.* at 14-15. Officer Hoder later identified the gun as a revolver with "live rounds and two fired rounds." *Id.* at 18. However, Officer Hoder testified that he was unable to apprehend Defendant at the time, because pit bulls were being held in the backyard. *Id.* at 14. Defendant then ran into the back door of the house on 51st Street. *Id.*

Officer Hoder testified that another individual then exited through the back door of the house and confronted him. *Id.* at 16. Officer Hoder told the individual that: "a man just shot a firearm and ran into the house, take back your dog, I need to get in there." *Id.* The individual responded by saying: "Get the fuck out of here . . . [y]ou are not coming back." *Id.* He also refused to restrain the dogs and re-entered the residence. *Id.* Accordingly, Officer Hoder left the backyard and met with Sergeant Santiago in front of the house. *Id.* at 19. The officers called for back-up, and the NYPD Emergency Services Unit (ESU) arrived soon thereafter. *Id.*

ESU Officer Molina testified that upon arrival, the ESU approached the house, knocked on the front door, and announced themselves as NYPD. *Id.* at 74. The ESU officers arrested the individual who opened the door, and upon entering the residence, Officer Molina noticed the strong odor of marijuana. *Id.* at 75. Two individuals were found inside the residence and were arrested. *Id.* One of those arrested was the individual who had previously told Officer Hoder to leave the premises. *Id.* at 17. Officer Molina and the other ESU officers then searched the premises, and while looking for Webster, Officer Molina located a garbage bag filled with a substance he recognized to be marijuana. *Id.* at 76.

Officer Hoder testified that he then entered the house to search for Webster, and while he was inside the house, he allegedly smelled the odor of fresh marijuana. *Id.* at 23–24. During his search, Officer Hoder also observed a bag of marijuana, as well as bulletproof vests and a scale in the basement. *Id.*

Following the search, Officer Hoder applied for and received a search warrant. *Id.* at 25. In the search pursuant to the warrant, officers located approximately 40 pounds of marijuana, bulletproof vests, firearms, ammunition, scales, and nearly $60,000 in cash. *See id.* at 26, Opp. at Ex. 15.[1]

## III. Findings of Fact and Law

Defendant challenges many of the factual premises that the government proffered at the suppression hearing. *See* Dkt. 40 ("Reply"). Below, the Court addresses the factual and legal disputes raised in Defendant's Motion to Suppress.

---

[1] Although the exact amounts of marijuana or currency were not established at the Suppression Hearing, Defendant does not challenge the government's stated amounts in his Motion to Suppress.

A. <u>The Fired Shots</u>

Defendant argues that Officer Hoder did not recall which way he was facing when he heard the alleged gunshots, and that Officer Hoder did not observe the muzzle flash or any other indications of criminal activity. Reply at 2. Accordingly, Defendant argues, the alleged gunshots could have come from other houses in the heavily-populated, residential neighborhood, and the "emergency exception" did not justify Officer Hoder's entry into the premises. *Id.* at 2-3.

"It is well-settled, as [the Second Circuit has] repeatedly said, that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement to act without delay." *United States v. Moreno*, 701 F.3d 64, 72–73 (2d Cir. 2012) (internal citations omitted). Exigent circumstances encompass the need to assist persons who are seriously injured or threatened with such injury. *Id.* The determination of whether exigent circumstances are established is an objective one. *Id.* The core question is whether the facts, "as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008). A "burning building," for example, "clearly presents an exigency of sufficient proportions to render a warrantless entry reasonable." *Id.* (internal citations omitted).

Applying these standards, the Court rejects Defendant's arguments. Officer Hoder specifically testified that after he heard the gunfire, he ran "directly to the rear of the location where [he] heard gunfire"—*e.g.*, 417 East 51st Street. Tr. at 8, 10, 12. On cross-examination, Officer Hoder did have trouble identifying the direction he was facing. *Id.* at 33. However, Officer Hoder's inability to remember that detail is not dispositive. It is reasonable for a police

officer to have heard gunshots coming from a specific location at the time the shots were fired, but later forget which direction he was facing and where the gunshots came from relative to his position. Officer Hoder's inability to remember those specific details does not mean that *at the time* of the gunshots, he was unable to pinpoint the location of the gunshots.

Further, it is eminently reasonable for an officer to hear gunshots coming from a residential neighborhood and immediately investigate the origin of the gunshots. *See U.S. v. Ashburn*, 11-CR-303, 2014 WL 1800409, at *5 n. 6 (E.D.N.Y. May 6, 2014) (Garaufis, J.) (collecting cases in which reports of gunshots were found to constitute exigent circumstances). The presence of gunshots in a residential neighborhood is sufficiently exigent to provide an exception to the warrant rule because: 1) the gunshots may have created injury to others, and 2) the gunshots indicate that a crime may be in progress or may have been committed. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). Defendant points to no authority holding that hearing the gunshot alone, even absent other evidence of criminal activity, is insufficient to create an exception to the warrant requirement. *Cf. Klump*, 536 F.3d at 118 (holding that it was reasonable for firefighters to enter a warehouse after smelling "an odor of something burning," since "[n]othing in the Fourth Amendment required them to wait until they saw actual smoke or flames to enter a building that they reasonably believed might be on fire."). Accordingly, the Court finds that Officer Hoder justifiably entered the backyard of the 51st Street residence and holds that no Fourth Amendment violation occurred.

B.    Officer Hoder's Credibility

Defendant also challenges Officer Hoder's credibility.  In particular, Defendant recounts Officer Hoder's statements that he had recovered the gun near a tree and his claim that he took pictures of the recovered handgun.  Reply at 3.  Defendant claims that Officer Hoder's picture depicted a gun lying on a grassy area.  *Id.* at 3 (citing Government Exhibits 4, 17).  However, according to Defendant, there are no trees or grass in the backyard of the premises, and the entire backyard is covered in concrete.  *Id.*  Defendant claims that the pictures that Officer Hoder took instead depicted the yard of the adjoining residence.  *Id.* at 4.  Based on these facts, Defendant argues that Officer Hoder's "entire testimony must be rejected as incredible and not worthy of belief."  *Id.*

Defendant's characterizations of the evidence are incorrect.  Government Exhibit 17, which depicts the gun, does not show a "grassy" area, but instead depicts a dirt area covered with fallen leaves and lined with concrete.  *See* Opp. at Ex. 17.  This dirt area is consistent with Defense Exhibits 13-14, which purport to show the 51st Street residence, and which show small areas of dirt surrounded by concrete.  *See* Reply at Exs. 13-14.  Further, although Defendant argues that "Government Exhibits 4 and 17 depict the adjoining yard of the residence next door to 417 East 51[st] Street," Reply at 4, no testimony or evidence in the record supports this statement.  Accordingly, the Court does not find that Officer Hoder's testimony was untrustworthy or that his account of the events of January 17, 2013 should be discredited.

C. Officer Hoder's Entry into the Residence

Defendant argues that no exigent circumstances justified Officer Hoder's search of the house to locate the Defendant.  Reply at 8.  According to Defendant, the "aggressive" pit bulls stopped Officer Hoder from entering the house, and Officer Hoder waited until ESU arrived to

enter the house, so Officer Hoder could not have been in "hot pursuit" of Defendant. *Id.* at 6–7. Further, Defendant argues that Officer Hoder did not observe Defendant discharge the firearm on the garage and that the pitch black lighting would have prevented Officer Hoder from seeing the gun. *Id.* at 9. Defendant claims that Officer Hoder had no reason to believe that Defendant was armed, that anyone inside the presence was in danger, or that any evidence inside the premises would imminently be destroyed. *Id.* at 10. Finally, because a perimeter was established, Defendant argues there was no likelihood that anyone would have escaped from the home while a warrant was being obtained. *Id.* Defendant avers that after the ESU officers searched the house and told Officer Hoder that they had not found anyone inside, Officer Hoder had no reason to believe that Defendant remained in the house. *Id.* at 10–11.

Defendant's arguments are unconvincing. The hot pursuit doctrine applies when a pursuit is immediate and relatively continuous from the scene of a crime. *See Webster v. City of New York*, 333 F. Supp. 2d 184, 195 (S.D.N.Y. 2004) (Sweet, J.) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). A slight delay in Officer Hoder's chase of a fleeing suspect did not end his hot pursuit of the Defendant. *Cf. U.S. v. Santana*, 427 U.S. 38, 42–43 (1976) ("The District Court was correct in concluding that 'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about (the) public streets.'"). Officer Hoder's calling for backup did not interrupt this hot pursuit either, because the ESU's efforts were a continuation of Officer Hoder's attempts to locate the armed individual he saw on the garage. *See United States v. Acosta-Soto*, 08-CR-10193, 2009 WL 3432442, at *5 (D. Mass. Oct. 21, 2009) ("The government . . . should not be penalized for a momentary pause in which to determine whether continued hot pursuit would be necessary to secure evidence which might be destroyed.").

Moreover, as explained in Section III.A, exigent circumstances justified Officer Hoder's entry into the residence. After Officer Hoder confronted the Defendant and the Defendant dropped a gun before running into the house, it was reasonable to conclude that the Defendant could pose a danger to the occupants of the home or the community. *See United States v. Berry*, 3:05-CR-40, 2006 WL 587329, at *3 (D. Conn. Mar. 2, 2006) ("The officers already knew that Berry had willfully brandished a loaded firearm; it was reasonable for them to believe that he might possess additional weapons and that persons inside the house could be in immediate danger."). This conclusion was buttressed by Officer Hoder's heated confrontation with the second individual, who refused to restrain the dogs even after Officer Hoder informed him about the gunshot. Based on his possession of the gun on the garage and his fleeing into the residence, it is objectively reasonable to believe that Defendant could have gained access to more guns in the residence—a danger that was heightened by the potential that the second individual was a co-conspirator of Defendant. Further, despite the fact that ESU was not able to locate Defendant in the house, Officer Hoder testified that he witnessed Defendant run into the house just a few minutes earlier, and there was no indication that Defendant had fled from the residence. Accordingly, it was objectively reasonable for Officer Hoder to believe that Defendant was in the residence and posing a danger there. Officer Hoder's attempts to enter the residence were protected under the exigent circumstances test, and no Fourth Amendment violation occurred.[2]

---

[2] Because, as explained in Section III.B, the Court credits Officer Hoder's testimony, the Court does not give credence to Defendant's argument that it was too dark to see the gun. *Cf.* Tr. at 16 (Officer Hoder testifying that it was not "pitch black" at the time of the events in question). Moreover, although Defendant claims that Officer Hoder did not see Defendant actually discharge the gun, Officer Hoder testified that he heard a gunshot and later witnessed Webster "on top of the shed with his arm extended in the sky holding an object that appeared to be a gun." Tr. at 12. This combination of facts, even absent the officer's direct observation of the gun being fired, is sufficient to support a finding of exigent circumstances. *See supra* Section III.A.

D. Marijuana in Plain View

Defendant argues that the marijuana that Officer Molina witnessed in the black garbage bag was not in plain view because Officer Molina did not testify that the garbage bag was open and that the marijuana was visible. *Id.* at 13. Further, Officer Molina allegedly did not know where the odor of marijuana was coming from specifically and he did not observe any other indications of the marijuana trade such as scales or ziplock bags. *Id.* Accordingly, Defendant argues that the warrant was invalid and that the two loaded semiautomatic .380 caliber pistols, two loaded .357 caliber revolvers, approximately $58,228 in currency, and 40 pounds of marijuana should be suppressed. *Id.* at 14.

The Court disagrees. The plain view doctrine is a "well-recognized exception to the Fourth Amendment warrant requirement." *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (citing *Ruggiero v. Krzeminski*, 928 F.2d 558, 561–62 (2d Cir. 1991). Pursuant to the doctrine, "law enforcement personnel may seize an item without a warrant provided that it is immediately apparent that the object is connected with criminal activity, and further provided that the officers viewed the object from a lawful vantage point—i.e., that the officers have not violated the Fourth Amendment in [ ] arriving at the place from where they can see the object." *Andino*, 768 F.3d at 99–100 (citing *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 81 (2d Cir. 2002) (internal quotation marks omitted)).

Here, Officer Molina testified that he saw the bag of marijuana and recognized it as such when he was searching the house for the suspect. Tr. at 76. The exhibit that Officer Molina identified as the bag of marijuana depicts a bag that sits open easily, due to the amount of marijuana contained within it. *See* Opp. at Ex. 12. Officer Hoder also confirmed that he saw the black garbage bag during his search of the house; that he recognized the substance in the bag as

9

marijuana when he saw it; and that he only searched areas in which a person could have fit. Tr. at 23-24. Despite this testimony, Defendant fails to point to any contravening evidence demonstrating that the bag was closed or that the marijuana was concealed. Thus, the Court finds that the bag of marijuana was legally discovered and could provide a valid basis for the subsequently obtained warrant. Because the warrant was valid, the objects found pursuant to the warrant—the firearms, approximately $58,228 in currency, and 40 pounds of marijuana—will not be suppressed.[3]

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress, Dkt. 28, is hereby DENIED. The physical evidence recovered from the residence at 417 East 51st Street, Brooklyn, New York, will not be excluded from further proceedings in this case.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge

Dated: January 6, 2015
　　　　Brooklyn, New York

---

[3] While the bag of marijuana in plain view is independently sufficient to support the warrant, the Court also notes that Officers Hoder and Molina testified that they smelled the odor of marijuana. *See* Tr. at 23, 61, 75. Officer Hoder testified that it emanated from "through the whole house." *Id.* at 61. This evidence further supports the basis on which the search warrant was issued.